UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:

                                                    Chapter 7

         CORALIA ARANA                                  Case No. 05-33757
         and FIDEL E. ARANA,

                                  Debtors.
-----------------------------------------------------------------x

# MEMORANDUM DECISION ON MOTION TO REOPEN

Appearances:

| | |
|---|---|
| David M. Harrison, Esq. | Laura M. Papa, Esq. |
| Metrotech | Ralph V. Morales, Esq. |
| 48 Willoughby Street | Shaub, Ahmuty, Citrin & Spratt, LLP |
| Brooklyn, NY 11201 | 1983 Marcus Avenue |
| *Attorneys for Coralia Arana and* | Lake Success, NY 11042 |
| *Fidel E. Arana* | *Attorneys for Mount Sinai Hospital* |

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

In late September 2005, Fidel and Coralia Arana sued Mount Sinai Hospital and another defendant in New York State Supreme Court for medical malpractice.  They allege that Mr. Arana has serious and permanent injuries caused by Mount Sinai's failure to treat a staph infection, including vision loss, partial paralysis, and brain damage, and they seek more than $1 million in damages.  Less than three weeks later, on October 15, 2005, the Aranas were among the thousands of debtors in this District to file a bankruptcy case in the days and hours before the Bankruptcy Code was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  They did not disclose their malpractice action in their bankruptcy filings, and did not reveal it during the Section 341 meeting of creditors conducted by the case trustee.  They were represented by counsel in their malpractice action, but not in their bankruptcy case.

Now, nearly six years later, the Aranas seek to reopen this bankruptcy case in order to add their claim against Mount Sinai to their bankruptcy filings, so that the malpractice action may proceed on the merits in New York state court.  Without this relief, it is likely to be dismissed.  Mount Sinai objects, on grounds that the bankruptcy process should not reward the Aranas for their bad faith in failing to disclose the malpractice action, and that any other outcome would result in a windfall to them.

At base, this motion poses the question of who should benefit and who should suffer from the Aranas' failure to disclose the malpractice action when they filed this bankruptcy case in 2005.  It implicates questions of law and fact, including the standard under Bankruptcy Code Section 350(b), which permits a court to reopen a bankruptcy case "to administer assets, to accord relief to the debtor, or for other cause," as well as the interests of creditors and the Aranas' good faith.  11 U.S.C. § 350(b).  The motion also requires consideration of certain basic

bankruptcy principles, including the debtor's duty of full and honest disclosure and the administration of unscheduled property of the estate by a bankruptcy trustee.

The Court concludes that the determination whether to reopen a case under Section 350(b) to add an undisclosed asset requires consideration of the benefit to creditors, the benefit to the debtor, and the prejudice to the affected party. Among these considerations, the benefit to creditors is uppermost. Where a debtor has acted in bad faith or otherwise engaged in inequitable conduct, this determination also requires consideration of an appropriate remedy.

Here, the prospect of a benefit to creditors and the Debtors outweighs any prejudice to Mount Sinai. And the record does not establish that the Aranas acted in bad faith or inequitably, so it is not necessary to craft a supplemental remedy. For these reasons, and based on the entire record, the motion to reopen this bankruptcy case is granted.

### Jurisdiction

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(1). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Civil Procedure 52, as made applicable by Federal Rule of Bankruptcy Procedure 7052.

### Background

*The Procedural Context*

Two legal proceedings form the background of this motion. The first is a medical malpractice action in New York State Supreme Court, Kings County that was brought by the Aranas on September 26, 2005 (the "Malpractice Action"). The second is this Chapter 7 bankruptcy case that the Aranas filed on October 15, 2005. They filed their bankruptcy

schedules and statements some two weeks later, on October 31, 2005.  The Aranas are
represented by personal injury counsel in the Malpractice Action and received assistance from
We the People USA, Inc., a bankruptcy petition preparer, in connection with their bankruptcy
case.

The Aranas scheduled $7,000 in assets, consisting of clothing, household goods, and
furnishings, but did not disclose the Malpractice Action or indicate that they had any claims or
other non-exempt assets.  The Aranas listed $112,862.83 in unsecured debt, and no secured debt.

John Pereira was appointed as Chapter 7 Trustee.  On December 15, 2005, the Aranas
appeared *pro se* with an interpreter at the meeting of creditors held pursuant to Bankruptcy Code
Section 341(a) (the "341 Meeting") and were examined by Ann Marie Sinisi, a representative of
the Trustee.  The Aranas responded with the assistance of the interpreter to all of the questions
that were asked, stated that they did not have any lawsuits or claims, and the meeting was closed.
Just a few days later, on December 19, 2005, the Trustee issued a report of no distribution and on
April 20, 2006, the Court issued an order granting the Aranas a discharge and closing the case
without a distribution to creditors.

Meanwhile, discovery proceeded slowly in the Malpractice Action.  Mr. Arana was
deposed on June 16, 2006, and Ms. Arana was deposed on November 13, 2006.  Ms. Arana
testified that she and Mr. Arana filed for bankruptcy in 2005.  Some three years later, on July 15,
2009, the Aranas' counsel filed a Note of Issue and Certificate of Readiness, certifying that the
Malpractice Action was ready for trial.

By Order to Show Cause dated October 5, 2010, almost four years after Ms. Arana
testified at her deposition that this bankruptcy case had been filed, Mount Sinai moved to dismiss

the Malpractice Action on grounds that the Aranas lacked the capacity to sue because they did

not disclose their claim against Mount Sinai in their bankruptcy case.  Mount Sinai's motion was

scheduled to be heard on October 28, 2010, but before it was decided, the Aranas, now

represented by counsel, brought this motion to reopen their bankruptcy case.

      This Court held an initial hearing on the motion to reopen on June 2, 2011.  The parties

filed a Joint Pre-Hearing Statement on June 29, 2011, and the Court held an evidentiary hearing

on July 8, 2011 at which the Aranas testified and exhibits were received.  At the conclusion of

the hearing, the Court reserved decision.

### The Evidence

      The Aranas, by their counsel Friedman, Khafif & Sanchez, LLP ("Friedman, Khafif"),

filed a Complaint, Bill of Particulars, Supplemental Bill of Particulars, and Second Supplemental

Bill of Particulars in the Malpractice Action, and each is supported by an attorney verification

signed by Andrew Friedman of Friedman, Khafif.  The Aranas allege that Mr. Arana suffered

severe and permanent injuries as a result of Mount Sinai's malpractice.  The Bill of Particulars

states that Mr. Arana sustained injuries including staphylococus aureus, staph infection, septic

emboli, coma, loss of vision, partial paralysis, loss of neurological function, and an inability to

move his feet and legs.  The Aranas seek special damages of $1 million for physicians' services,

$500,000 for hospital expenses, and $250,000 for lost wages.

      Mr. Arana testified that the Malpractice Action arises from his having "caught a virus at

[Mount Sinai] [H]ospital."  Tr. 63:11.  Mr. Arana stated that he has "blood in [his] brain" as a

result of the virus, and that he has "balance . . . and memory problems."  Tr. 64:21; 65:20-22;

65:25.  Ms. Arana testified that when they filed their bankruptcy case, she was working but Mr.

Arana was "very sick" and "handicapped."  Tr. 51:16-17, 22.

The Aranas filed their bankruptcy case on October 15, 2005, the weekend before the October 17, 2005 effective date of much of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").  Their filing was prompted by their understanding of the impact of the impending change in the law.  As Ms. Arana testified, she "heard on the news that [October 15, 2005] was the last opportunity to go and declare bankruptcy, otherwise they will go after my check, after my . . . salary."  Tr. 36:7-11.

Ms. Arana took the lead in preparing the bankruptcy filing.  She made two visits to the offices of We the People, and Mr. Arana accompanied her on the second visit in order to sign papers.  Ms. Arana testified that she believed We the People were her attorneys.  She also stated that the representative with whom she met, Patricia Tews, did not explain the documents that she signed because Ms. Tews spoke only English.  The Aranas speak Spanish as a first language and very limited English.

Ms. Arana testified that Ms. Tews did not ask if the Aranas had any pending lawsuits or other assets.  Ms. Arana stated that We the People did not ask her for any information other than her name, address, and Social Security number.  Mr. Arana likewise testified that his only contact with We the People was when he went to their offices to sign papers, and that he did not receive any information from them during that visit.

The Aranas also described their contact with counsel in the Malpractice Action.  Mr. Arana recalled that he first met with Emil Sanchez from Friedman, Khafif at his home while Ms. Arana was at work, and that he later traveled to the firm's offices for a second meeting.  Mr. Arana did not recall whether these meetings were before or after he went to We the People.  Mr.

Arana testified that at the meeting at his home, he told Mr. Sanchez that he wanted to bring a lawsuit based on his injuries, and that Mr. Sanchez said, "'Okay.  I'm going to inquire if we can bring this lawsuit, and I'll let you know about this.'"  Tr. 69:5-8.  Mr. Arana did not recall whether he retained Friedman, Khafif before or after the 341 Meeting.

Ms. Arana testified that at the time of the 341 Meeting, Mr. Arana's initial meeting with Mr. Sanchez had occurred but she had not met with any attorneys about the Malpractice Action. She also explained that she brought Mr. Arana to the offices of Friedman, Khafif for another meeting some time after she met with We the People.  Ms. Arana did not recall signing a retainer agreement or other documents in connection with the Malpractice Action.

Mr. Arana signed several authorizations for the release of health information pursuant to HIPAA dated November 18, 2005, and others dated March 15, 2006, permitting the release of medical information to Mount Sinai's attorneys.  He did not remember whether he signed the first authorization before the 341 Meeting.  Mr. Arana testified that he did understand how a lawsuit is begun, and that the first time he understood that the Malpractice Action had been commenced was about one year after the 341 Meeting.

At the 341 Meeting, the Aranas testified that their bankruptcy filings were true and correct as follows:

| Ms. Sinisi: | Now, I show you your petition, schedules, and statement of affairs. Is that your signature? |
|---|---|
| Mr. Arana: | Yes. |
| Ms. Sinisi: | Is everything in there true and correct to the best of your knowledge? |
| Mr. Arana: | Yes. |

JPHS Exh. 10.

They also testified that they were not suing anyone and did not have any claims against

anyone in connection with their physical condition as follows:

| | |
|---|---|
| Ms. Sinisi: | Are you suing anyone? |
| Ms. Arana: | No. |
| Mr. Arana: | No. |
| Ms. Sinisi: | Does anyone owe you money? |
| Ms. Arana: | No. |
| Mr. Arana: | No. |
| . . . | |
| Ms. Sinisi: | What's the $37,000 that's listed to O.C. Oliver Medical Center? That's a medical bill? |
| Ms. Arana: | Yes. |
| . . . | |
| Ms. Sinisi: | And did you receive any injuries that you have any claims against anyone for in relationship to your illness or your physical condition? |
| Mr. Arana: | No. |
| Ms. Arana: | No. |

JPHS Exh. 10.

When questioned about this testimony, Ms. Arana explained that she understood the

question "Are you suing anyone?" to refer to whether her "creditors were going to bring a

lawsuit against [her]." Tr. 35:8-15. She also stated that at the time of the 341 Meeting, she "was

not suing anybody" and that "[w]e were just asking questions, making some inquires about it."

Tr. 27:18; 27:21-22. Ms. Arana explained that she understood the question "Did you receive any

injury that you have any claims against anyone for?" to concern whether she had "sustained any

injuries." Tr. 36:21-24. And Ms. Arana testified that during the pendency of the bankruptcy

case, no one told her that the Malpractice Action was related to her bankruptcy and that she did

not know that it was.

Mr. Arana explained that he believed he "was not suing anybody" at the time of the 341

Meeting because his understanding of "Are you suing anybody?" was that it referred "to

bring[ing] a lawsuit against somebody" and that his attorneys had told him "that they were going

7

to see if they were – if they could bring the case." Tr. 80:15-23.  And when asked about his

response to the question "Did you receive any injury that you have any claims against anyone

for?" Mr. Arana said that he "did not understand the question" and "thought that they were

asking about the creditors that [were] bringing some type of lawsuit against [him]." Tr. 81:17-

25.

### Discussion

This motion is governed by Bankruptcy Code Section 350(b) and Bankruptcy Rule 5010,

which set the standard for reopening a bankruptcy case.  It also implicates the fundamental

bankruptcy principles of a debtor's duty of full and honest disclosure and the administration of

unscheduled property of the estate by a trustee in bankruptcy.

### *The Debtor's Duty of Full and Honest Disclosure*

As the Supreme Court has stated on several occasions, the benefits of the bankruptcy

process are reserved for the "honest but unfortunate debtor."  *Marrama v. Citizens Bank of

Mass.*, 549 U.S. 365, 367 (2007) (internal quotation marks omitted).  These benefits are

accompanied by significant obligations, including disclosure obligations.  As one court notes:

> A long standing tenet of bankruptcy law requires that one seeking its benefits
> satisfy a companion duty to schedule all his interests and property rights.  Simply
> stated, a debtor seeking shelter under the bankruptcy law must disclose all assets
> and potential assets.  Full and honest disclosure in a bankruptcy case is crucial to
> the effective functioning of the bankruptcy system.  Because the bankruptcy
> court, trustees, and creditors rely on the information disclosed by a debtor, the
> importance of full disclosure cannot be overemphasized.

*In re Lowery*, 398 B.R. 512, 515 (Bankr. E.D.N.Y. 2008) (citations omitted).

That is, the price of a discharge in bankruptcy is high, and the disclosure requirements of

the Bankruptcy Code and Rules are onerous indeed.  Debtors must reveal far more information

than would be required to defend a creditor's collection action, or in most other civil litigation. An individual debtor must "disclose *all* his interests at the commencement of a case . . . ." *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) (citing 11 U.S.C. § 521(a)(1)(B)(i) and (iii)). This obligation "is a continuing one and does not end with the filing of the bankruptcy petition." *Lowery*, 398 B.R. at 515. To this end, a debtor may amend "[a] voluntary petition, list, schedule, or statement . . . as a matter of course at any time before the case is closed." Fed. R. Bankr. P. 1009(a).

Whether represented by counsel or proceeding *pro se*, debtors must also sign their bankruptcy petitions under the penalty of perjury. Dishonesty can bring severe consequences, including revocation of discharge and civil sanctions. *See* 11 U.S.C. § 727(d) (stating that a debtor's discharge may be revoked if it was obtained by fraud); *Estate of Perlbinder v. Dubrowsky (In re Dubrowsky)*, 206 B.R. 30, 37 (Bankr. E.D.N.Y. 1997) (awarding sanctions against debtor who provided false information in his schedules and statement of financial affairs). And the knowing and fraudulent concealment of property belonging to the estate of a debtor is a federal crime punishable by a fine, a prison term of up to five years, or both. *See* 18 U.S.C. § 152; *United States v. Shadduck*, 112 F.3d 523, 532 (1st Cir. 1997) (affirming convictions of debtors who concealed bank account).

<u>*The Bankruptcy Estate, the Trustee, and Standing*</u>

When a bankruptcy petition is filed, an estate is created and the debtor's property, including any prepetition claims held by the debtor, becomes part of the bankruptcy estate. As the Second Circuit has explained, property of the bankruptcy estate encompasses "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative

. . . ." *Chartschlaa*, 538 F.3d at 122 (internal quotation marks omitted). *See* 11 U.S.C. § 541.

In a Chapter 7 case, the United States Trustee appoints an interim Chapter 7 trustee and unless a different trustee is elected pursuant to Section 702(b) and (c), that trustee serves as the permanent case trustee. *See* 11 U.S.C. §§ 701(a)(1), 702(b), 702(d). Only the Chapter 7 trustee may administer property of the estate, including bringing actions on behalf of the estate. *See* 11 U.S.C. §§ 323, 704. And the debtor's rights to estate assets, including prepetition claims, "are extinguished unless the asset is abandoned back to the debtor [by the trustee]." *Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268, 1272 (11th Cir. 2004). *See* 11 U.S.C. § 554.

Accordingly, during the pendency of a bankruptcy case, the debtor does not have standing to initiate or pursue an action based on a prepetition claim unless the trustee abandons it back to the debtor. *See, e.g.*, *Hopkins v. Foothill Mountain, Inc. (In re Hopkins)*, 346 B.R. 294, 304 (Bankr. E.D.N.Y. 2006) (noting that it is "well settled that the trustee is the proper or real party in interest to prosecute prepetition causes of action"); *Wright v. Meyers & Spencer, LLP*, 46 A.D.3d 805, 805, 849 N.Y.S.2d 274, 274-75 (N.Y. App. Div. 2d Dep't 2007) (affirming dismissal of action that accrued prior to plaintiff's bankruptcy filing as the "action [could] not be maintained by the plaintiff in his individual capacity").

When an action is disclosed by a debtor, the trustee may seek to be substituted as the plaintiff and pursue the claim. *See, e.g.*, *SNR Holdings, Inc. v. Ataka Am., Inc.*, 54 A.D.2d 406, 409, 388 N.Y.S.2d 909, 912 (N.Y. App. Div. 1st Dep't 1976) (observing that "[g]enerally, a trustee at his election may be substituted as plaintiff for he represents the interests of the bankrupt and should be free to adopt a course most advantageous to the estate") (citing *Meyer v. Fleming*, 327 U.S. 161, 168 (1946)). A trustee may also allow a debtor to pursue an action on

behalf of the estate.  *See Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied sub nom. Gold v. Panalpina, Inc.*, 522 U.S. 810 (1997).  And when the bankruptcy case is closed, "correctly scheduled property not otherwise administered by the trustee is abandoned to the debtor."  *Lopez v. Speciality Rests. Corp. (In re Lopez)*, 283 B.R. 22, 31 (B.A.P. 9th Cir. 2002) (Klein, J., concurring).

When an action is not disclosed by the debtor, it remains property of the bankruptcy estate even after the case is closed – indeed, unless it is administered or abandoned by the trustee, the action remains property of the estate "forever."  *Id*.  As explained by the Second Circuit, "[w]hile properly scheduled estate property that has not been administered by the trustee normally returns to the debtor when the bankruptcy court closes the case, undisclosed assets automatically remain property of the estate after the case is closed."  *Chartschlaa*, 538 F.3d at 122.  *See Lowery*, 398 B.R. at 515 (noting that an undisclosed personal injury action "remains property of the estate even after the closing of [the] bankruptcy case"); *123 Cutting Co. v. Topcove Assocs.*, 2 A.D.3d 606, 607, 770 N.Y.S.2d 365, 365 (N.Y. App. Div. 2d Dep't 2003) (observing that "it is well settled that a debtor's failure to list a legal claim as an asset in his or her bankruptcy proceeding causes the claim to remain the property of the bankruptcy estate and precludes the debtor from pursuing the claim on his or her own behalf") (internal quotation marks omitted).

But a debtor's failure to schedule a prepetition action may only be a speedbump, not a roadblock, on the road to a recovery for the bankruptcy estate.  The debtor or another party in interest may attempt to avert dismissal by seeking to reopen the bankruptcy case and amend the schedules to list the action so that "a chapter 7 trustee can be appointed, investigate whether the

11

[a]ction has value, and then prosecute it, settle it, abandon it, or arrange for [the debtor] to prosecute it in exchange for the estate receiving a share of the proceeds." *Lopez*, 283 B.R. at 28. If it appears to the trustee that there may be a recovery and estate assets to distribute, then creditors can be notified, claims can be filed, and if all goes well, a distribution can be made to creditors.

One further point merits note.  Even when a bankruptcy case is reopened, the schedules are amended, the trustee is substituted as plaintiff, the action is pursued, and a recovery is obtained, there is no guarantee that a debtor will enjoy any benefit whatsoever.  The trustee brings the action on behalf of the estate, and proceeds must first go to pay the trustee's expenses and the creditors' claims.  *See, e.g.*, *In re Upshur*, 317 B.R. 446, 453 (Bankr. N.D. Ga. 2004) (observing that "a motion to reopen a Chapter 7 case to add undisclosed claims should generally be granted so that the claim can either be liquidated for the benefit of creditors or released from the estate").

And if surplus funds remain after these expenses and claims are paid, then a debtor's entitlement to it may be subject to judicial estoppel or other equitable defenses.  *Id*. (noting that while judicial estoppel generally does not apply after a case is reopened, "[t]he exception might be if the trustee recovered more than the amount necessary to satisfy all creditors.  In that event, the defendants could invoke judicial estoppel to try to limit any monetary recovery to the amount needed to satisfy creditors and the trustee's expenses").[1]  This is because first and last, a debtor

---

[1] Judicial estoppel is an equitable doctrine that may "prevent[] a party from 'asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding.'"  *Negron v. Weiss*, 2006 WL 2792769, at *3 (E.D.N.Y. Sept. 27, 2006) (quoting *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037 (2d Cir. 1993)).  When a debtor does not disclose a claim, the doctrine may bar the pursuit of that claim in another forum.  *See*

who has crossed the line from honest but unfortunate to dishonest and scheming should not be permitted to profit from intentional misconduct that offends the integrity of the bankruptcy process. *See Lowery*, 398 B.R. at 516 (concluding that "[t]he public interest in the systemic integrity of the bankruptcy process dictates that a bankruptcy court should withhold relief that encourages the concealment of assets by debtors").

With these principles in mind, the Court turns to the standards for reopening a case under Bankruptcy Code Section 350(b).

*Reopening a Case Under Section 350(b)*

Bankruptcy Code Section 350(b) states that a bankruptcy case that has been fully administered and closed "may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b). A motion to reopen a case may be made by the debtor, the trustee, or another party in interest. *See* Fed. R. Bankr. P. 5010. If a case is reopened, then the court must determine whether it is necessary to appoint a trustee "to protect the interests of creditors and the debtor or to insure

---

*Coffaro v. Crespo*, 721 F. Supp. 2d 141, 145 (E.D.N.Y. 2010). At the same time, equitable estoppel may not bar a trustee from pursuing the claim because the debtor, not the trustee, took inconsistent positions. *See Reed v. City of Arlington*, --- F.3d ---, 2011 WL 3506100, at *8 (5th Cir. Aug. 11, 2011) (en banc) (finding that "[a]bsent unusual circumstances, an innocent bankruptcy trustee may pursue for the benefit of creditors a judgment or cause of action that the debtor – having concealed that asset during bankruptcy – is himself estopped from pursuing"); *Parker*, 365 F.3d at 1272 (finding that judicial estoppel did not bar the trustee because he did not make a false statement).

New York state courts have held that judicial estoppel does not apply when a bankruptcy case is reopened under Section 350. *See Miller v. Berti*, 1 A.D.3d 885, 885-86, 767 N.Y.S.2d 729, 729 (N.Y. App. Div. 4th Dep't 2003); *Koch v. Nat'l Basketball Ass'n*, 245 A.D.2d 230, 231, 666 N.Y.S.2d 630, 631 (N.Y. App. Div. 1st Dep't 1997). This is because reopening the case "'nullif[ies] the final determination upon which a judicial estoppel could be predicated.'" *Miller*, 1 A.D.3d at 886, 767 N.Y.S.2d at 729 (quoting *Koch*, 245 A.D.2d at 231, 666 N.Y.S.2d at 631).

efficient administration of the case."  Fed. R. Bankr. P. 5010.

Debtors typically seek to reopen a case in order to amend their schedules to add a previously undisclosed creditor or asset, or to commence a lien avoidance action.  *See, e.g.*, *In re Stein*, 394 B.R. 13, 15 (Bankr. E.D.N.Y. 2008); *Upshur*, 317 B.R. at 450.  Although Section 350(b) does not define "cause," courts have found cause to reopen under these circumstances.  *See Stein*, 394 B.R. at 15 (citing cases).  As the Third Circuit observed, "[i]t is well-recognized that a bankruptcy proceeding may be reopened to administer estate assets and to determine whether additional assets may be available for creditors of the estate."  *Zinchiak v. CIT Small Bus. Lending Corp. (In re Zinchiak)*, 406 F.3d 214, 224 (3d Cir. 2005).  This determination is generally a straightforward one, and in most instances, the decision to reopen a case is "ministerial and presents a limited range of issues, including whether further administration of the estate appears to be warranted."  *Apex Oil Co. v. Sparks (In re Apex Oil Co.)*, 406 F.3d 538, 543 (8th Cir. 2005).

Bankruptcy courts have broad discretion when deciding whether to reopen a closed case.  *See In re Farley*, 451 B.R. 235, 237 (Bankr. E.D.N.Y. 2011); *Lowery*, 398 B.R. at 514.  The decision "invoke[s] the exercise of a bankruptcy court's equitable powers, which is dependent upon the facts and circumstances of each case."  *Katz v. I.A. Alliance Corp. (In re I. Appel Corp.)*, 104 Fed. Appx. 199, 200 (2d Cir. 2004) (internal quotation marks omitted).  *See Apex Oil Co.*, 406 F.3d at 542.  And when "deciding whether to reopen a case under § 350(b), courts . . . 'ought to emphasize substance over technical considerations.'"  *Stein*, 394 B.R. at 15 (quoting *Batstone v. Emmerling (In re Emmerling)*, 223 B.R. 860, 864 (B.A.P. 2d Cir. 1997)).

The moving party has the burden of establishing cause to reopen.  *See, e.g.*, *In re*

*Mortensen*, 444 B.R. 225, 227 (Bankr. E.D.N.Y. 2011).  When deciding whether to reopen a closed case, courts should generally consider the benefit to creditors, the benefit to the debtor, the prejudice to the affected party, and other equitable factors.  *See Stein*, 394 B.R. at 15 (stating that "courts may consider equitable concerns" and "the benefit to the debtor, the prejudice to the affected entity and the benefit to the creditors") (internal quotation marks and alterations omitted); *In re Koch*, 229 B.R. 78, 85-86 (Bankr. E.D.N.Y. 1999); *Upshur*, 317 B.R. at 450. Additional factors include the availability of relief in another forum, whether the estate has been fully administered, and the length of time between the closing of the case and the motion to reopen.  *See, e.g.*, *Apex Oil Co.*, 406 F.3d at 542-43.

As the determination is based on equitable factors, a debtor's good faith may be a significant consideration.  *See Koch*, 229 B.R. at 87-88 (observing that "[t]he lack of the element of good faith suggests an all too casual disregard for the disclosure requirements of this Court, and the fair and equitable treatment of [the debtor's] creditors as called for by the Bankruptcy Code, since they did not benefit from the reopening"); *Lowery*, 398 B.R. at 515 (citing with approval those courts that conclude that "good faith is an important element that a court looks to in authorizing the reopening of a bankruptcy case to include a lawsuit of the debtor").

Several courts have concluded that when a debtor seeks to reopen a case to add an undisclosed asset, such as a lawsuit, "the most important consideration is the benefit to the creditors."  *Upshur*, 317 B.R. at 450 (citing cases).  *See In re Lewis*, 273 B.R. 739, 747 (Bankr. N.D. Ga. 2001) (observing that "the persuasive factor for the Court to weigh in deciding whether to reopen this case is not its effect upon the Debtor or upon the . . . Defendants in a state court forum, but rather the effect a reopening would have on the creditors of the Debtor's estate").

15

Indeed, notwithstanding the broad discretion courts have when deciding a motion to reopen, "courts have held that the court 'has a duty to reopen the estate whenever there is proof that it has not been fully administered,' and to permit the addition of an asset to the schedules." *Stein*, 394 B.R. at 16 (quoting *Lopez*, 283 B.R. at 27).  *See Kozman v. Herzig (In re Herzig)*, 96 B.R. 264, 266 (B.A.P. 9th Cir. 1989) (noting that it is an abuse of discretion to deny a motion to reopen where "'assets of such probability, administrability and substance . . . appear to exist as to make it unreasonable under all the circumstances for the court not to deal with them'") (quoting *In re Johnson*, 291 F.2d 910, 911 (8th Cir. 1961)).  As noted by a leading commentator:

> Some courts have looked to whether the debtor's nondisclosure was intentional . . . .  However, the better view is that creditors in the bankruptcy case should not be deprived of their ability to be paid proceeds of the asset regardless of the debtor's intent, and that the bankruptcy case should ordinarily be reopened so the asset can be administered to prevent a windfall to the defendant.

3 Collier on Bankruptcy ¶ 350.03[1] at 350-7 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010).

But if creditors are not likely to benefit from the addition of an asset, the balance tips in the other direction, and relief may not be warranted.  As one court observed, "[w]here the chance of any substantial recovery for creditors appears too remote to make the effort worth the risk, a trial court does not abuse its discretion in denying a motion to reopen."  *Herzig*, 96 B.R. at 266 (internal quotation marks omitted).  *See Koch*, 229 B.R. at 86-88 (vacating its order reopening case where due to the debtor's bad faith conduct, creditors would not benefit from the addition of an undisclosed lawsuit).

In considering the benefit to the debtor, courts generally consider whether reopening the case serves some beneficial purpose, such as allowing claims to proceed in another forum.  *See,*

16

*e.g.*, *Katz v. I.A. Alliance Corp. (In re I Appel Corp.)*, 300 B.R. 564, 571 (S.D.N.Y. 2003) (noting that reopening bankruptcy case would allow debtor's claim to proceed), *aff'd*, 104 Fed. Appx. 199 (2d Cir. 2004); *Koch*, 229 B.R. at 86-88 (vacating its prior order to reopen the case where reopening did not cure standing defect because the case was converted from Chapter 7 to Chapter 11). "Indeed, a case may be reopened to administer surplus assets for the benefit of a debtor." *Stein*, 394 B.R. at 18 (citing *In re Graff*, 255 F. 241, 242 (2d Cir. 1918)).

And when a debtor's bad faith conduct has harmed creditors so that they will not benefit from the reopening of the case, a court may decline to reopen the case to protect the integrity of the bankruptcy process. *See, e.g.*, *Koch*, 229 B.R. at 86-88. But "[b]ad faith cannot be inferred from the possibility that the Debtor may obtain a surplus in the event the trustee successfully enforces the estate's interest . . . ." *Stein*, 394 B.R. at 18.

When a debtor seeks to reopen a case to add an undisclosed asset, the benefit to the debtor and the prejudice to the affected party have been described as "inextricably linked" because "[i]f reopening the case benefits the debtor, it necessarily prejudices the defendant; if not reopening the case benefits the defendant, it necessarily prejudices the debtor." *Lewis*, 273 B.R. at 747. Courts recognize that a defendant may be prejudiced for a number of reasons, including the impact that adding the claim will have on the defendant's motion to dismiss for lack of standing. *See, e.g.*, *Koch*, 229 B.R. at 86.

At the same time, the obligation to defend a claim on the merits is not the kind of legal prejudice that should stand in the way of a trustee's administration of property of a bankruptcy estate and this factor, standing alone, should not be a bar to reopening a case. As one court noted, loss of a defense "does not outweigh the benefit to the creditors and the Debtor of

17

reopening the case." *Stein*, 394 B.R. at 18. As another court observed, "it is often difficult to perceive non-obfuscatory merit in a defendant's opposition to reopening; it ought to be in the interest of defendant to be in a position to have a definitive resolution of the matter." *Lopez*, 283 B.R. at 32 (Klein, J., concurring). *See* 3 Collier on Bankruptcy ¶ 350.03[1] at 350-7 (observing that "the bankruptcy case should ordinarily be reopened so the asset can be administered to prevent a windfall to the defendant").

Neither Section 350(b) nor Rule 5010 limits the time to make a motion to reopen. But the doctrine of laches may be grounds for denying a motion to reopen. Laches may bar relief when a party unreasonably delays taking an action and the affected party is prejudiced by the delay. *See Stein*, 394 B.R. at 16 (citing *Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.*, 959 F.2d 409, 423 (2d Cir. 1992)). But "[t]he mere lapse of time does not constitute prejudice, and '[a] court of equity must consider whether reopening a case would prejudice the adversary's position.'" *Stein*, 394 B.R. at 16 (quoting *Emmerling*, 223 B.R. at 864). Finally, some courts have found that "[a]s the time between closing of a bankruptcy case and its reopening increases, so must the cause for reopening increase in weight." *Lowery*, 398 B.R. at 515 (citing *Citizens Bank & Trust Co. v. Case (In re Case)*, 937 F.2d 1014, 1018 (5th Cir. 1991)).

<u>*Whether the Aranas Have Established Cause To Reopen this Case*</u>

The Aranas argue that their case should be reopened to permit them to amend their schedules to include the Malpractice Action because their nondisclosure of the suit was a good faith mistake, their creditors will benefit from the reopening of the case, and Mount Sinai is the only party that will not benefit. They contend that while their case was pending, they did not understand that they were required to disclose the Malpractice Action. The Aranas argue that

they were unaware of this obligation because they filed *pro se*, their papers were prepared by a bankruptcy petition preparer, and they have a limited understanding of English. And they state that they answered the questions at the 341 Meeting truthfully and to the best of their ability based on their understanding of those questions and the status of the Malpractice Action at that time.

Mount Sinai argues that the case should not be reopened because the Aranas intentionally and in bad faith concealed the Malpractice Action when they filed this case, they will impermissibly benefit from the reopening of the case, and they will receive a windfall because after so many years, it will be difficult or impossible to provide meaningful notice to creditors so that they may file proofs of claim. Mount Sinai also argues that in order to prevail, the Aranas "must demonstrate that [they] acted in good faith in failing to include the lawsuit as a disclosed bankruptcy asset." Obj. ¶ 20. And Mount Sinai argues that a case should not be reopened where the debtor's conduct suggests an attempt to obtain a benefit at the expense of creditors.

Mount Sinai contends that the Aranas knew full well that the Malpractice Action was pending when they filed their bankruptcy case because that action was commenced less than three weeks before their petition was filed. It also notes that soon thereafter, Mr. Arana signed HIPAA authorizations allowing the hospital's attorneys to see copies of his medical records. Mount Sinai argues that the Aranas knew of their obligation to disclose the Malpractice Action as a result of the specific questions about pending lawsuits and claims on their bankruptcy schedules and statements. And it notes that the Aranas had the assistance of an interpreter at the 341 Meeting but denied that they were suing anyone, and that Mr. Arana denied that he had "any injuries that he had any claims against anybody for in relationship to his illness or physical

19

condition." JPHS at 7.

Benefit to Creditors

The prospect of a benefit to creditors is the most important consideration in determining whether to reopen a bankruptcy case to add an undisclosed asset. The Aranas list thirty unsecured creditors with claims ranging from $25.60 to $37,693.50, for a total of $112,862.83 in unsecured claims. These creditors did not receive a distribution when the case was closed in April 2006, and collection of their claims is now subject to the Aranas' bankruptcy discharge.

The Aranas' pleadings, including the Complaint, Bill of Particulars, Supplemental Bill of Particulars, and Second Supplemental Bill of Particulars, describe serious injuries. The Aranas seek special damages of $1 million for physicians' services, $500,000 for hospital expenses, and $250,000 for lost wages. If the case is reopened to allow the Malpractice Action to be added, a trustee will be appointed to administer this asset and to provide notice to creditors of the deadline for filing proofs of claim. Based on the amount of potential damages, if the trustee is successful in the Malpractice Action then the creditors' claims and costs of administration may well be paid in full. But if the case is not reopened, the Malpractice Action likely will be dismissed without affording a trustee the opportunity to administer this asset for the benefit of creditors. Under these circumstances, the potential benefit to creditors weighs heavily in favor of reopening the case.

This conclusion is not altered by the timing of the Aranas' motion, which was brought nearly five years after this bankruptcy case was closed. Mount Sinai argues that many of the creditors may no longer be in business, or may operate under a different name or at a different address, so that the trustee will not be able to provide meaningful notice of the reopening of the

case and the opportunity to file a proof of claim.  Mount Sinai also argues that even if a creditor receives notice, the documents necessary to substantiate the claim may be difficult to locate or no longer exist, and for this or other reasons, creditors may decide not to file a proof of claim. But this is true in every bankruptcy case in which an asset is disclosed or discovered after the case is commenced.  And the risk that some creditors may not be located or file a claim does not outweigh the benefit to creditors who receive notice and decide to file claims.  Viewed another way, a trustee ought to be given an opportunity to provide notice to creditors, and creditors ought to be given the opportunity to file claims.  Only after the case is reopened and a trustee is appointed can the trustee determine how to proceed, based on an investigation of the asset and the claims that are filed.

Nor is this a case where the conduct of the debtor has foreclosed any possible recovery to the creditors.  If this case is reopened, the creditors stand to reap a substantial benefit if the trustee prevails in the Malpractice Action.  The record does not show, or even suggest, that any conduct of the Aranas stands in the way of a distribution to creditors.  And where creditors stand to benefit, they should not be deprived of a potential recovery based on the debtor's failure to disclose an asset.

Benefit to the Debtors

Consideration of benefit to the debtor begins with the simple question of whether reopening the case serves a useful or beneficial purpose, including permitting a claim to proceed in another forum.  *See Katz*, 300 B.R. at 571; *Koch*, 229 B.R. at 87-88.  The Aranas claim that Mount Sinai caused Mr. Arana to suffer severe and permanent injuries.  Mr. Arana testified that he suffers from "blood in [his] brain" and has "balance . . . and memory problems."  Tr. 64:21;

21

65:25.  If this case is reopened and a trustee is appointed, the trustee can be substituted as

plaintiff in the Malpractice Action and proceed with the claim.

Benefit to the debtor also calls for the court to consider whether the debtor may receive a

surplus.  Here, if the trustee recovers an amount that exceeds the claims and costs of

administration, the Aranas may benefit through the recovery of a surplus.  Under these

circumstances, the potential benefit to the Debtors weighs in favor of reopening the case.

This conclusion is not altered by the Aranas' conduct.  The record does not establish that

the Aranas' failure to disclose their claim against Mount Sinai was the product of bad faith or

fraud.  To be sure, they were required to disclose any potential or actual lawsuits or claims in

their schedules and at the 341 Meeting, and they did not do so.  Their failure to disclose the

Malpractice Action raises a question as to their good faith – but it does not answer it.  Here, the

Aranas' testimony was straightforward, credible, and consistent with their lack of sophistication

in legal and financial matters, and shows that they were not aware of their obligation to disclose

their claim against Mount Sinai.

The Aranas represented themselves throughout their bankruptcy case.  They, like

thousands of other debtors at the time, rushed to file before BAPCPA's effective date.  Their

command of English is not strong, and they filed this case with the assistance of We the People,

a bankruptcy petition preparer with a role that is narrowly defined by the Bankruptcy Code, not a

lawyer.  *See* 11 U.S.C. § 110(e)(2)(A) and (B) (limiting the services that a bankruptcy petition

preparer may provide).[2]

---

[2]  At the time, We the People was enjoined from explaining to debtors what they were
required to disclose.  As it stated in the Certification of Bankruptcy Petition Preparer filed with
the Aranas' petition, it complied with a stipulated preliminary injunction that barred it from

22

The Aranas testified credibly that they did not understand the questions about pending lawsuits and claims in their bankruptcy filings. Their testimony is consistent with their limited understanding of English, their lack of counsel, and the circumstances under which they filed this case. The Aranas also testified credibly that they were not aware of the status of their claim against Mount Sinai when their bankruptcy petition was filed and when their 341 Meeting took place. In particular, the credible testimony shows that when Mr. Arana met with his personal injury counsel at his home before the 341 Meeting, he understood that they were looking into whether a lawsuit could be brought. And Mr. Arana testified that he did not know that the Malpractice Action had been commenced until about a year after the 341 Meeting.

The Aranas' testimony is not gainsaid by the pleadings in the Malpractice Action, including the Complaint and the Bills of Particulars, which were signed by the Aranas' counsel but not by them. Nor is it inconsistent with Mr. Arana's signing of HIPAA authorizations on November 18, 2005 and March 15, 2006, as these documents do not indicate that Mr. Arana was aware that the Malpractice Action was proceeding, or that he was required to disclose it in the bankruptcy case.

In addition, the Aranas testified credibly about their understanding of the questions asked by the Trustee's counsel. That testimony shows that they did not understand the meaning of "claim," or their obligation to disclose their claim against Mount Sinai regardless of whether a lawsuit had been commenced.

Finally, the evidence does not show that the Aranas' failure to disclose the Malpractice

───────────────────────────

"explaining or providing information necessary to complete the petition[.]" Stipulated Preliminary Injunction at 2, *Martini v. We the People Forms and Service Centers USA, Inc.*, Adv. Pro. No. 05-01434 (Bankr. S.D.N.Y. May 11, 2005) (No. 14).

Action was motivated by fraud or done in an attempt to score a windfall at the expense of their creditors. And the evidence likewise does not demonstrate that reopening this case under these circumstances imperils the integrity of this Court or the bankruptcy process.

Prejudice to Mount Sinai

The third consideration is whether Mount Sinai, as the affected party, is prejudiced by the reopening of this case. There can be no doubt that Mount Sinai views itself as disadvantaged if this case is reopened, because it will be required to defend the Malpractice Action on the merits. But that is not the same as legal prejudice, and it is difficult for this Court to conclude that the obligation to defend the Malpractice Action amounts to legal prejudice against Mount Sinai. And if this case is not reopened, Mount Sinai may receive a windfall to the extent that the Malpractice Action may well be dismissed based on a technical defense that is far afield from the merits of the claims and defenses.

Viewed another way, Mount Sinai has not shown that it will be prejudiced other than by having to defend the Malpractice Action on the merits if this case is reopened. For example, there is no evidence of prejudice in terms of additional expense – other than the costs associated with making the motion to dismiss and objecting to the motion to reopen – or the availability of evidence. Indeed, it appears that the Malpractice Action, commenced in September 2005, was not ready for trial until July 2009. And while Mount Sinai learned of the Aranas' bankruptcy case at Ms. Arana's deposition in November 2006, it did not move to dismiss the Malpractice Action until October 2010, almost four years later. Under these circumstances, any prejudice to Mount Sinai does not weigh against reopening the case.

## Conclusion

24

For the reasons stated herein, and based on the entire record, the Debtors' case will be reopened to allow the Debtors to amend their schedules to include the Malpractice Action and the appointment of a trustee.  An order in conformity with this Memorandum Decision shall be entered simultaneously herewith.

Dated: Brooklyn, New York
      September <u>**22**</u>, 2011

*s/ Elizabeth S. Stong*
HONORABLE ELIZABETH S. STONG
UNITED STATES BANKRUPTCY JUDGE
